UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DINARA M. STORFER, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>ANNE DWELLE, and individual;<br>ROBERT WAKEFIELD, an individual;<br>WAKEFIELD & DWELLE, PLLC, an<br>Idaho professional limited liability<br>company,<br><br>          Defendants. | Case No. 3:12-cv-00496-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Defendants Anne Dwelle, Robert Wakefield, and Wakefield & Dwelle, PLLC,

seek summary judgment on plaintiff Dinara M. Storfer's claims for professional

negligence and negligent infliction of emotional distress. (Dkt. 23-24). Ms. Storfer's

claims arise from her divorce from her former husband, Jeff Kline. Defendants argue that

they did not have an attorney-client relationship with Ms. Storfer, and thus owed her no

duty of care, with respect to the divorce. But Defendants admit they had an attorney-

client relationship with Ms. Storfer regarding an earlier estate matter, and the parties

dispute the duration of that attorney-client relationship, whether an independent attorney-

client relationship existed between Ms. Storfer and Attorney Dwelle during the divorce proceeding, and whether and when Ms. Storfer effectively waived the duties Defendants owed to her as a current or former client. This case is rife with disputed material facts, and so summary judgment is not proper.

## BACKGROUND

Ms. Storfer was born and raised in Kazakhstan and came to the United States in 1996, when she was twenty years old. Compl. ¶¶ 7-8; Dkt. 24-1 at 7 (Storfer Depo. at 10). English is her third language. Ms. Storfer met and married her now ex-husband, Jeff Kline, not long after arriving in the United States. Compl. ¶¶ 9-10.

In 2002 and 2003, the couple sought estate planning advice from Robert Wakefield at Wakefield & Dwelle. Attorney Wakefield drafted various estate planning documents for them. Dkt. 24-2 at 3 (Wakefield Depo. at 7-8). Those documents included a living trust, which held all of the property that the couple owned at the time the trust was created and provided for the distribution of the trust property if the couple were to divorce. Dkt. 26-2 at 5, 56; *but see* Dkt. 24-2 at 8 (Wakefield Depo. at 25) (in which Attorney Wakefield explained that the "purpose of th[at] section would be in case there would be the possibility that the parties would divorce but not dissolve the trust somehow," but that he was "not sure exactly how that would happen"). Mr. Kline and Ms. Storfer were trustees, with Attorney Wakefield and Attorney Anne Dwelle as successor trustees. Dkt. 24-1 at 47 (Dwelle Depo. at 52).

According to Ms. Storfer, the couple's marriage went downhill in 2002, shortly after she finished her Ph.D. and gave birth to the couple's first son. Compl. ¶¶ 13-15. She gave up her career at Mr. Kline's insistence, instead dedicating herself to raising their sons and managing the household. Compl. ¶¶ 13-15. Mr. Kline became the sole breadwinner, and had complete control over the family finances. Compl. ¶¶ 11, 16, 23. Ms. Storfer alleges that Mr. Kline also became emotionally and sexually abusive, threatened her with physical violence, and threatened to take their sons away. Compl. ¶¶ 15-20, 27-31.

Ms. Storfer moved out of the family home in June 2010, but still returned every day to run the household and take care of their sons. Compl. ¶ 25. When Mr. Kline and Ms. Storfer began discussing divorce, including the division of their marital property, Ms. Storfer alleges that Mr. Kline acted as though the marital property belonged exclusively to him. Compl. ¶ 26. Ms. Storfer did not know the value of their marital property or what rights she had to that property. Compl. ¶ 26.

Sometime in the spring or summer of 2010, Mr. Kline contacted Attorney Wakefield about the breakdown of his marriage. Dkt. 24-2 at 16 (Wakefield Depo. at 57). Attorney Wakefield suggested to Mr. Kline that his partner, Anne Dwelle, represent Mr. Kline in the divorce because she had more divorce experience. Dkt. 24-2 at 16 (Wakefield Depo. at 57). Attorney Dwell and Mr. Kline began communicating back and forth regarding the divorce and distribution of assets "a fair amount of time before" September 2010. Dkt. 26-4 at 9-11 (Dwelle Depo at 18-20). With the exception of a

string of e-mails from September 23 and 24, 2010, Attorney Dwelle no longer has any record of those conversations.  Dkt. 24-1 at 44 (Dwelle Depo. at 39-40) (in which Attorney Dwelle explains that she permanently deletes client e-mails when her Gmail account gets full, which happens approximately "every couple of months").  The e-mails that have been produced show that Attorney Dwelle relied on Mr. Kline to relay information between Ms. Storfer and Attorney Dwelle.  Dkt. 26-5 at 2-5.  For example, Attorney Dwelle asked Mr. Kline to provide her with Ms. Storfer's current address, to which Mr. Kline responded that Ms. Storfer "doesn't know her address," and later that she "has no idea what her physical address is.  She says to use my office address." Dkt. 26-5 at 2, 5.

According to Attorney Dwelle's most recent deposition testimony, she first discussed the divorce with Ms. Storfer at a meeting on August 20, 2010.  Dkt. 24-1 at 38 (Dwelle Depo. at 16).  Ms. Storfer denies that meeting ever took place.  Dkt. 24-1 at 12, 17 (Storfer Depo. at 29, 50).  On September 27, 2010, the couple met at Wakefield & Dwelle and signed a notice of dissolution of trust.  Ms. Storfer also signed a conflict waiver purporting to waive any conflict created by Attorney Dwelle's representation of Mr. Kline in the divorce.  The record does not reflect which document Ms. Storfer signed first.  Dkt. 24-2 at 15 (Wakefield Depo. at 54); Dkt. 24-1 at 43 (Dwelle Depo. at 34).

Attorney Wakefield drafted the notice of dissolution on his own initiative after discussing the divorce with Attorney Dwelle and determining that the trust would need to be dissolved before the couple could divide their property.  Dkt. 24-2 at 14 (Wakefield

Depo. at 50, 52); Dkt. 24-1 at 40 (Dwelle Depo. at 22-24). The notice of dissolution stated that "[t]he trustees are divorcing and allocating the trust property by means of a Property Settlement Agreement of even date herewith," and was notarized by Attorney Dwelle. Dkt. 24-1 at 21-22. The property settlement agreement was not actually executed until a couple of weeks later. Dkt. 26-6 at 2-10.

Attorney Dwelle drafted the waiver without consulting the Idaho Rules of Professional conduct or seeking the Idaho Bar's advice regarding the conflict or waiver. Dkt. 24-2 at 16 (Wakefield Depo. at 58); Dkt. 24-1 at 42-43 (Dwelle Depo. at 31-34). The waiver states:

> I, Dinara Kline, understand that Anne Dwelle and Robert Wakefield of the firm Wakefield and Dwelle, cannot represent both my husband Jeff and me in an action for divorce. I acknowledge that both Anne and Bob worked with both my husband and me when we discussed estate planning and drafted our Living Trust, wills, living wills, etc., but I do not feel that either Anne or Bub obtained any information at that time which they would use to disadvantage me in the current divorce settlement negotiations.
>
> I have been advised by both Anne and Bob that I can retain another lawyer to represent me in the divorce action and review any agreements which my husband and I might reach. Anne and Bob have explained the term "conflict of interest" as it affects me, and I fully understand the consequences of signing this waiver.
>
> Having satisfied myself that no true conflict of interest exists, I consent to either Anne Dwelle or Robert Wakefield's representation of my spouse in an action for divorce.

Dkt. 24-1 at 19. Both Attorney Dwelle and Attorney Wakefield maintain that they did not believe their representation of Mr. Kline in the divorce presented a "true conflict." Dkt. 24-2 at 15 (Wakefield Depo. at 55); Dkt. 24-1 at 43 (Dwelle Depo. at 33). Even though "technically" Attorney Wakefield "was privy to information which could have

been used by one against the other," he claims that "practically" speaking, he did not believe he learned anything from his prior representation of the couple that could have been used against Ms. Storfer in the divorce. Dkt. 24-2 at 15 (Wakefield Depo. at 55).

The couple met at Wakefield & Dwelle again on October 8, 2010, at which time the couple executed the property and custody settlement agreement and divorce decree. Dkt. 26-6 at 2-16. The divorce documents provided Ms. Storfer with one million dollars of the marital estate, no spousal or child support, and granted primary custody of their two sons to Mr. Kline. Dkt. 26-6.

Although the parties do not dispute that Mr. Kline and Ms. Storfer executed the dissolution of trust, waiver, and divorce documents on September 27 and October 8, they dispute almost the entirety of the circumstances surrounding the execution of those documents and the relationship between the parties.

### A.    August 20, 2010 Meeting

During Attorney Dwelle's December 2013 deposition in this case, she testified that she first discussed the divorce with Ms. Storfer on August 20, 2010. Dkt. 24-1 at 38 (Dwelle Depo. at16). But during Attorney Dwelle's September 2012 deposition in a related case, brought by Ms. Storfer against Mr. Kline, Attorney Dwelle testified that she first discussed the divorce with Ms. Storfer on September 27. Dkt. 26-4 at 8, 14 (Dwelle Depo. at 17, 23). Attorney Dwelle has no record of the August 20 meeting, and she admits that she only remembered the date of that meeting after reading Mr. Kline's corresponding diary entry. Dkt. 24-1 at 38, 42 (Dwelle Depo. at16-18, 42); Dkt. 26-4 at

8, 14 (Dwelle Depo. at 17, 23).  Ms. Storfer contests that the meeting ever took place. Dkt. 24-1 at 12, 17 (Storfer Depo. at 29, 50).

During her deposition in this case, Attorney Dwelle further claimed that her representation of Mr. Kline began, and Attorney Wakefield's representation of Ms. Storfer ended, at the August 20 meeting.  Dkt. 24-1 at 38 (Dwelle Depo. at 16). However, Defendants confirmed in an August 2012 letter regarding related litigation that they represented Ms. Storfer until September 27, when Ms. Storfer signed the waiver. Dkt. 26-4 at 3, 8 (Dwelle Depo. at 12, 17); Dkt. 24-2 at 12, 14 (Wakefield Depo. at 41-42, 49).  Most recently, in their motion for summary judgment, Defendants argue that their representation of Ms. Storfer ended in 2003 when Attorney Wakefield finished the estate matter.  Defs.' MSJ at 16.

Finally, Attorney Dwelle testified that she first advised Ms. Storfer to get her own attorney at the August 20 meeting, and that she may have specifically recommended attorney Jennifer Ewers, who shares an office and assistant with Defendants.  Dkt. 24-1 at 38, 47 (Dwelle Depo. at 18-19, 49-51).  Ms. Storfer claims that Defendants did not directly advise her to see Attorney Ewers, but that Mr. Kline gave her that recommendation.  Dkt. 24-1 at 12, 15 (Storfer Depo. at 30, 43).  Through the attorneys' shared assistant, Defendants learned that Ms. Storfer had made, and later cancelled, an appointment with Attorney Ewers.  Dkt. 24-2 at 15-16 (Wakefield Depo. at 56-57); Dkt. 24-1 at 47 (Dwelle Depo. at 49-51).  Defendants saw no problem with Attorney Ewers representing Ms. Storfer, even though they shared an office and an assistant, nor did they

find it problematic that the assistant relayed information to Defendants regarding Ms. Storfer's appointments with Attorney Ewers.  Dkt. 24-2 at 16 (Wakefield Depo. at 57); Dkt. 24-1 at 47 (Dwelle Depo. at 50-52).

**B.      September 27, 2010 Meeting**

According to Ms. Storfer, Defendants put the waiver and notice of dissolution in front of her on September 27 and simply showed her where to sign.  Dkt. 24-1 at 14-15 (Storfer Depo. at 37-42).  Ms. Storfer did not have time to read the documents before signing them, did not understand all of the terms, and did not understand what effect the documents would have.  Dkt. 24-1 at14-15 (Storfer Depo. at 37-42).  She signed in part because she thought Defendants were helping the couple out, and in part because she feared what Mr. Kline, who was present throughout the meeting, would do if she refused.  Dkt. 24-1 at 13-16 (Storfer Depo. at 35-36, 40, 43, 47).

Defendants have no record of the September 27 meeting, other than the waiver and notice of dissolution themselves.  Dkt. 24-1 at 44-46 (Dwelle Depo. at 39-40, 44, 46); Dkt. 24-3 at 12 (Wakefield Depo. at 43-44).  Defendants testified that they spoke extensively with Ms. Storfer about the waiver and advised that she get another attorney's opinion before signing.  Dkt. 24-2 at 15-16 (Wakefield Depo. at 53, 58); Dkt. 24-1 at 43 (Dwelle Depo. at 35-36).  Attorney Dwelle admits, however, that they did not explain the advantages and disadvantages of signing the waiver and told Ms. Storfer that no conflict existed.  Dkt. 24-1 at 44 (Dwelle Depo. at 37).

Attorney Wakefield claims, curiously enough, that he represented neither Mr. Kline nor Ms. Storfer during the dissolution of trust, Dkt. 24-2 at 15 (Wakefield Depo. at 53). Attorney Wakefield admits he did not advise Ms. Storfer to get another attorney's advice before signing the notice of dissolution, Dkt. 24-2 at 15-16 (Wakefield Depo. at 53, 58), and he did not explain its meaning or effect, Dkt. 24-2 at 15 (Wakefield Depo. at 53). Attorney Dwelle claims that she represented only Mr. Kline in that transaction, Dkt. 24-1 at 40 (Dwelle Depo. at 23); she explained the notice of dissolution's effect, Dkt. 26-4 at 6 (Dwelle Depo. at 15); and she advised Ms. Storfer to see another attorney if she had any questions, Dkt. 24-1 at 47 (Dwelle Depo. at 49).

### C.     October 8, 2010 Meeting

Ms. Storfer and Mr. Kline signed the divorce decree and property and custody settlement agreement at Wakefield & Dwelle on October 8.[1] Ms. Storfer testified, and Defendants deny, that Mr. Kline stayed throughout the meeting, during which Ms. Storfer asked Attorney Dwelle if everything was "legitimate and legal," to which Attorney Dwelle responded that Ms. Storfer was getting "a good deal." Dkt. 24-1 at 16 (Storfer Depo. at 45-48). Ms. Storfer did not understand the effect of the documents or the value of the marital estate—which she now estimates to be five million dollars—until months later. Dkt. 24-1 at 15-16 (Storfer Depo. at 42-48); Dkt. 26-4 at 17-18.

---

[1] Just four days before, Attorney Dwelle e-mailed Mr. Kline because Ms. Storfer had not come in to sign the divorce documents as expected. Dkt. 26-10 at 2. Mr. Kline responded as follows: "Good lord, we've talked a few times and she's vacillating now, wondering if she should get an attorney. What if we threw a clause in that said she could see the boys three hours/day after school, or any time she wants." Id. The record does not contain Attorney Dwelle's response.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party bears the initial burden of showing that there is no material factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party makes that showing, the burden shifts to the nonmoving party to show, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' that 'there is a genuine issue for trial.'" *Id.* at 234 (quoting Rule 56). The court must view the evidence in a light most favorable to, and draw all reasonable inferences in favor of, the non-moving party. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir 2014).

## ANALYSIS

### I.    Professional Negligence

"The relationship of client and attorney is one of trust, binding an attorney to the utmost good faith in fair dealing with his client, and obligating the attorney to discharge that trust with complete fairness, honor, honesty, loyalty, and fidelity." *Blough v. Wellman*, 974 P.2d 70, 72 (Idaho 1999). If an attorney breaches those duties, the client may hold the attorney liable by proving: "'(a) the existence of an attorney-client relationship; (b) the existence of a duty on the part of the lawyer; (c) failure to perform the duty; and that (d) the negligence of the lawyer [was] a proximate cause of the damage

to the client.'" *Bishop v. Owens*, 272 P.3d 1247, 1251 (Idaho 2012) (quoting *Johnson v. Jones*, 652 P.2d 650, 654 (Idaho 1982)).

Defendants contend that they are entitled to summary judgment because the undisputed facts show that they did not have an attorney-client relationship with, and thus owed no duties to, Ms. Storfer with respect to the divorce, and further that Ms. Storfer effectively waived any duties owed to her. Defendants' motion rests almost entirely on disputed material facts, and so summary judgment is not proper.

### A.     Attorney-Client Relationship

"Whether an attorney-client relationship exists is a question of fact." *Berry v. McFarland*, 278 P.3d 407, 411 (Idaho 2012) (internal quotation marks omitted). An attorney-client relationship is generally formed by "assent by both the putative client and attorney." *Id.* If a putative client seeks the attorney's advice, and the attorney "engages in conduct that could reasonably be construed as so agreeing, then there is an attorney-client relationship." *Id.* An attorney-client relationship may also be formed if the attorney "fail[s] to clarify whom the attorney is representing where, under the circumstances, one of the parties could reasonably believe that the attorney is representing that person's interests." *Id.* Once an attorney establishes an attorney-client relationship with a client, that relationship is imputed to each attorney practicing within the same law firm. *See* IRPC 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9.").

Attorney Wakefield indisputably formed an attorney-client relationship with Ms. Storfer in 2002 when he prepared the couple's estate plan. Dkt. 24-2 at 3 (Wakefield Depo. at 7-8). And Attorney Wakefield cannot reasonably argue that he represented neither Mr. Kline nor Ms. Storfer on September 27 when he independently determined that the couple needed to dissolve the trust, drafted a notice of dissolution, and then had the couple sign the notice of dissolution. Dkt. 24-2 at 14-15 (Wakefield Depo. at 50, 52-53). Attorney Wakefield's representation of Ms. Storfer in the estate matter is imputed to Wakefield & Dwelle and Attorney Dwelle. *See* IRPC 1.10.

Defendants' attempt to ignore the relationship between Attorney Wakefield and Ms. Storfer by arguing that they never formed attorney-client relationship with Ms. Storfer *as to the divorce matter* completely misses the mark. *See* Defs.' Reply at 4-6. As Ms. Storfer has explained, she need not have formed an attorney-client relationship with Defendants regarding the divorce in order to have a claim against Defendants. Pl.'s Opposition at 7-13.

Further, Ms. Storfer has presented sufficient evidence to create a factual dispute regarding whether she and Attorney Dwelle formed a separate attorney-client relationship during the divorce proceeding. Taking the facts in a light most favorable to Ms. Storfer, (1) Ms. Storfer did not have time to read and did not understand the waiver,[2] Dkt. 24-1 at

---

[2] Defendants' argument that Ms. Storfer is bound by the waiver even if she did not have time to read it and did not understand it fundamentally takes for granted that a conflict waiver is an ordinary, at-arm's-length contract between adversaries. Defs.' Reply at 9-10. Rather, it is *the attorney's duty* to ensure the client or former client gives informed consent. IRPC 1.0(e), Cmt. 6. As discussed more fully below, if Ms. Storfer did not in fact have time to read and did not understand the waiver, and if Defendants did not adequately explain the conflict, waiver, and alternatives, then Defendants failed to obtain informed consent and the waiver is invalid. *See* IRPC 1.0(e), Cmt. 6.

14-15 (Storfer Depo. at 37-42); (2) Ms. Storfer believed that Attorney Dwelle was helping the couple out and did not understand that Attorney Dwelle was representing only Mr. Kline, Dkt. 24-1 at 13 (Storfer Depo. at 35-36); and (3) Attorney Dwelle gave Ms. Storfer legal advice, including that Ms. Storfer was "getting a good deal" in the divorce, Dkt. 24-1 at 16 (Storfer Depo. at 45-48). Even though Ms. Storfer signed the waiver form, which stated that Defendants could not represent both Mr. Kline and Ms. Storfer in an action for divorce, Dkt. 24-1 at 19, such a waiver does not necessarily negate conduct of the parties that may amount to an attorney-client relationship. *Cf. Berry*, 278 P.3d at 411.

To the extent that Defendants blame Ms. Storfer's supposed confusion or misunderstanding on Mr. Kline, Defendants again fail to recognize that it was *their duty* to ensure that Ms. Storfer fully understood the nature and scope of her relationship with Defendants. *See* IRPC 1.0(e), Cmt. 6. Attorney Dwelle unwisely relied on Mr. Kline, *Ms. Storfer's adverse party*, to relay information (or possibly misinformation) between herself and Ms. Storfer. *See* Dkt. 26-5 at 2, 5 (e-mails from Mr. Kline, which twice stated that Ms. Storfer did not know her own address). If Ms. Storfer was truly a pro se party as Attorney Dwelle now claims, Attorney Dwelle should have communicated with Ms. Storfer directly.

Therefore, Attorney Wakefield may have breached the duties Defendants owed to Ms. Storfer as a current client by advising her to sign the notice of dissolution and by representing both her and Mr. Kline in that transaction, depending on the timing and

effectiveness of the waiver.  Attorney Dwelle's representation of Mr. Kline in the divorce matter may amount to a breach of the duties Defendants owed to Ms. Storfer as a current or former client, depending on when the attorney-client relationship ended and whether Ms. Storfer effectively waived the duties owed to her.

### B.        End of the Attorney-Client Relationship

An attorney-client relationship typically ends when the attorney finishes working on the specific matter for which he or she was retained.  *Berry*, 278 P.3d at 411.  But "[i]f the attorney agrees to handle any matters the client may have, the relationship continues until the attorney or client terminates the relationship."  *Id.*

Defendants' inconsistent admissions alone create disputed facts on this issue.  In August 2012, Defendants stated that the attorney-client relationship ended when Ms. Storfer signed the waiver on September 27, 2010, Dkt. 26-4 at 15; then, in December 2013, that it ended at the August 20, 2010, meeting, Dkt. 24-1 at 38 (Dwelle Depo. at 16); and, most recently, that it ended when Attorney Wakefield finished drafting the couple's estate plan in 2003, Defs.' MSJ at 16.  Attorney Wakefield's own testimony indicates that the attorney-client relationship existed as of September 27, when he prepared, and instructed the couple to sign, the notice of dissolution.  Dkt. 24-2 at 14 (Wakefield Depo. at 50, 52).  And Ms. Storfer has put forth sufficient evidence to show that the relationship may have continued throughout the divorce proceeding.  Dkt. 24-1 at 13-16 (Storfer Depo. at 35-48).

Importantly, Defendants have no engagement or disengagement letters to support their claim that the representation ended in 2003 with the conclusion of the estate planning, nor do they have any notes, e-mails, time records, or calendar entries to show that the August 20 meeting ever took place. Dkt. 24-1 at 38, 42 (Dwelle Depo. at 16-18, 42). Mr. Kline's notes, the only documentary support Defendants offer of the August 20 meeting, are completely illegible. Dkt. 24-1 at 30-33. This lawsuit is a prime example of why attorneys are wise to thoroughly document their activities and communications in a client's file.

### C. Duties Owed to Current Clients

The Idaho Rules of Professional Conduct ("IRPC") define the contours of the duties each attorney owes to his or her current and former clients. *Bishop*, 272 P.3d at 1251; *see also* Preamble to IRPC, Cmt. 20 (stating that the IRPC is "not designed to be a basis for civil liability" but that "since the [IRPC] establish[es] standards of conduct by lawyers, a lawyer's violation of a Rule may be evidence of breach of the applicable standard of conduct."). IRPC 1.7(a)(1) prohibits a lawyer from simultaneously representing current clients if "the representation of one client will be directly adverse to another client." Similarly, "a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated." IRPC 1.7, Cmt. 29.

Defendants indisputably formed an attorney-client relationship with Ms. Storfer in 2002. That relationship almost certainly existed as of September 27, 2010, when

Attorney Wakefield had Ms. Storfer sign the notice of dissolution, and may have

continued throughout the divorce proceeding.  Defendants owed her duties as a current

client so long as the attorney-client relationship continued.  *See Blough*, 974 P.2d at 72.

### D.    Duties Owed to Former Clients

Even after the representation of a client ends, "a lawyer has certain continuing

duties with respect to confidentiality and conflicts of interest."  IRPC 1.9, Cmt. 1;

*Damron v. Herzog*, 67 F.3d 211, 214 (9th Cir. 1995) (holding that Idaho lawyers owe

their former clients continuing duties of loyalty and confidentiality).  These duties

prohibit an attorney from "represent[ing] an interest adverse to a former client on a matter

substantially related to the matter of engagement."  *Damron*, 67 F.3d at 214; *see also*

IRPC 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not

thereafter represent another person in the same or a substantially related matter in which

that person's interests are materially adverse to the interests of the former").

A matter is substantially related if it "involve[s] the same transaction or legal

dispute or if there otherwise is a substantial risk that confidential factual information as

would normally have been obtained in the prior representation would materially advance

the client's position in the subsequent matter."  IRPC 1.9, Cmt. 3.  For example, "a

lawyer who has represented multiple clients in a matter [could not] represent one of the

clients against the others in the same or a substantially related matter after a dispute arose

among the clients in that matter," IRPC 1.9, Cmt. 1, and "a lawyer who has represented a

businessperson and learned extensive private financial information about that person may

not then represent that person's spouse in seeking a divorce," IRPC 1.9, Cmt. 3.

Ms. Storfer also points to *Mathias v. Mathias*, 525 N.W.2d 81, 84 (Wis. Ct. App. 1994),

for the proposition that "as a matter of law . . . estate planning which is reasonably

contemporaneous with initiation of divorce proceedings is substantially related to issues

which may arise in those proceedings."

Here, there are disputed material facts regarding whether the estate and divorce

matters were substantially related. The couple's estate plan structured and managed the

joint ownership of their property as co-trustees, and by its own terms, provided for the

disposition of that property at death *or divorce*. Dkt. 26-2 at 56. The division of the

couple's marital property, which was held in that trust, was central to the divorce. And

according to Attorney Wakefield, the only practical way to divide the marital property in

divorce was to first dissolve the trust. Dkt. 24-2 at 14 (Wakefield Depo. at 52).

Crucially, when Attorney Wakefield advised Ms. Storfer and Mr. Kline to dissolve

the trust, the estate and divorce matters were utterly indistinguishable. The trust was

dissolved *so that* the parties could divide the property in divorce. Dkt. 24-1 at 21 ("The

trustees are divorcing and allocating the trust property by means of a Property Settlement

Agreement . . . ."). The same day, maybe before or maybe after Ms. Storfer signed the

notice of dissolution, Defendants instructed her to sign a conflict waiver *so that*

Defendants could represent Mr. Kline in an action for divorce against Ms. Storfer, their

current or former client.

Although Attorney Wakefield did not believe any true conflict existed between the two matters, he admitted that because he "was privy to certain financial information about them while [he] was doing the estate planning, it could be that [he] would be disadvantaging one or the other if [he] represented one or the other." Dkt. 24-2 at 15 (Wakefield Depo. at 55). Moreover, the facts of this case mirror the example given in the IRPC, which prevents a lawyer who represented multiple clients in a matter from representing just one of them against the other in a substantially related matter after a dispute arose among them. IRPC 1.9, Cmt. 1. Given that the timing and substance of these two matters overlapped significantly, issues of fact remain regarding whether Defendants owed Ms. Storfer continuing duties of loyalty and confidentiality throughout the divorce proceeding.

### F.     Waiver of Duties

IRPC 1.7(b)(4) and IRPC 1.9(a) provide that a lawyer may represent a client despite a conflict of interest if the client gives "informed consent, confirmed in writing." "Informed consent" requires that the lawyer "communicat[e] adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." IRPC 1.1(e); *see also* IRPC 1.7, Cmt. 18. It may be appropriate, in some circumstances, for the lawyer to advise the client to consult with another attorney. Preamble to IRPC, Cmt. 6. Whether the client was represented by another attorney or was experienced in legal matters is relevant to determining the effectiveness of the waiver. *Id.*

Informed consent may be "given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent."  IRPC 1.1(b).  But the writing requirement "does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns."  IRPC 1.7, Cmt. 20.  If the attorney fails to adequately inform the client of the conflict, then the waiver may be invalid.  Preamble to IRPC, Cmt. 6.

Disputed facts remain regarding the effectiveness of the waiver.  First, the waiver itself fails to explain the material risks and reasonable alternatives to waiving the conflict, and even goes so far as to claim that there was no conflict at all.  Dkt. 24-1 at 19. Ms. Storfer denies that Defendants orally explained the risks of and alternatives to the waiver, Dkt. 24-1 at 14-15 (Storfer Depo. at 37-42), and Defendants testified that they told Ms. Storfer that no true conflict existed, Dkt. 24-2 at 15 (Wakefield Depo. at 55); Dkt. 24-1 at 43 (Dwelle Depo. at 33).  Second, Ms. Storfer has testified that she was inexperienced in legal matters, was not provided with the waiver before that day, and did not have time to read the waiver at the meeting.  Dkt. 24-1 at 14-15 (Storfer Depo. at 37-42).  Finally, it is undisputed that Ms. Storfer was not represented by independent counsel.

Even if the waiver were effective, the parties genuinely dispute *when* Ms. Storfer

waived the duties Defendants owed to her as either a current or former client. Defendants

now claim that the waiver was effective on August 20, 2010, when Attorney Dwelle

discussed the conflict with Ms. Storfer. Dkt. 24-1 at 38 (Dwelle Depo. at 16). But

Ms. Storfer claims the August 20 meeting never took place, Dkt. 24-1 at 17 (Storfer Depo

at 50), and Defendants have failed to retain *any* documentation of that meeting.

Assuming the August 20 meeting never occurred, the record does not reflect which

document—the waiver or dissolution of trust—Ms. Storfer signed first on September 27.

In short, Ms. Storfer's legal malpractice claims rest on numerous disputed material

facts for trial, and so summary judgment is not proper.

## II. Negligent Infliction of Emotional Distress

For a plaintiff to succeed on a negligent infliction of emotional distress claim, the

plaintiff must show "(1) a legal duty recognized by law; (2) a breach of that duty; (3)

a causal connection between the defendant's conduct and the plaintiff's injury; . . . (4)

actual loss or damage" and (5) "a physical manifestation of the plaintiff's emotional

injury." *Frogley v. Meridian Joint Sch. Dist. No. 2*, 314 P.3d 613, 624 (Idaho 2013). An

attorney will general owe a legal duty to a plaintiff only if the attorney and plaintiff had

an attorney-client relationship. *See Estate of Becker v. Callahan*, 96 P.3d 623, 627

(Idaho 2004); *Harrigfeld v. Hancock*, 90 P.3d 884 (Idaho 2004). For the reasons

discussed above, Defendants are not entitled to summary judgment on this claim.

## CONCLUSION

Defendants' motion for summary judgment rests on numerous disputed material facts going to the duration of their attorney-client relationship with Ms. Storfer, the duties Defendants may have owed Ms. Storfer, and the timing and effectiveness of Ms. Storfer's waiver of those duties. [3]  Defendants' motion for summary judgment is denied.  It will be up to a jury to resolve the disputed issues of fact after weighing all the evidence and the credibility the testifying witnesses.

## ORDER

**IT IS ORDERED:**

Defendants' Motion for Summary Judgment (Dkt. 24) is **DENIED**.

This matter shall be set for jury trial on Tuesday, December 9, 2014 at 9:30 a.m. at the Federal Courthouse in Coeur d'Alene, Idaho.

Motions in limine, if any, shall be filed thirty (30) days prior to trial. Response to motions in limine, if any, shall be filed within fourteen (14) days from the filing of the motion.  The Court, upon a review of the pending motions, will determine whether a hearing is necessary.

Witness lists shall be filed fourteen (14) days prior to trial, unless otherwise ordered or agreed upon. Witness lists shall contain the material listed in Fed. R. Civ. P. 26(a)(3)(A)&(B), and shall include a brief description of the subject matter of the witnesses' expected testimony.

---

[3] The Court has not considered the opinion of Kellie Kuster in any part of its decision.

Memorandum Decision and Order-21

Exhibit list shall be exchanged between the parties and submitted to the Court within fourteen (14) days prior to trial. The exhibit lists shall follow the guidelines set out in Local Rule 16.3. Plaintiff's Exhibits should be numbered and listed starting with "1." Defendants' Exhibits should be numbered and listed starting with "500." Each exhibit should be labeled with a color coded sticker. (Yellow for plaintiff; blue for defendant. Stickers are available at the Clerk's Office, US courthouse.) The number of the exhibit and number of the case should be on all exhibits. A copy of the exhibits should be delivered to opposing counsel. A set of originally marked exhibits and a copy of the exhibit list shall also be delivered to the Court on the day of trial, along with two complete sets of exhibit copies and exhibit lists for use of the Court and staff attorney. Impeachment exhibits will be marked, sealed and delivered only to the Court. Except for good cause shown, no exhibits or testimony will be received in evidence at trial unless presented in accordance with this order.

Trial briefs shall be exchanged between the parties and submitted to the Court within fourteen (14) days prior to trial. The Court is to be advised and briefed on all anticipated evidentiary problems before trial; no motions will be heard on the morning of a trial unless approved by the court in advance.

All proposed jury instructions are required to be filed and served at least fourteen (14) days prior to trial. The proposed jury instructions shall follow the guidelines set forth in Local Rule 51.1. Proposed jury instructions shall also be provided to chambers by

sending a "clean" set without cites or numbers, in a Wordperfect or WORD compatible document, to EJL_Orders@id.uscourts.gov.

All proposed voir dire questions are to be filed at least fourteen (14) days prior to trial. The Court will conduct voir dire of the jury panel. Counsel will be allowed to briefly question the jury panel following the Court's voir dire.

DATED: August 13, 2014

Edward J. Lodge
United States District Judge